(*b*) [Vide *Jackson* vs. *Mayo*, 11 *Mass. Rep.* 147. — *Martin* vs. *Mayo*, 10 *Mass. Rep.* 137. — ED.]

---

# PARKER ILSLEY AND OTHERS *versus* PETER STUBBS.

Of stoppage *in transitu.*

[The house of *W. & S.* shipped certain merchandise, in their vessel, to the house of *L. & Co.* in *Liverpool*, with which house they had an account current; *L. & Co.*, on receipt of the outward cargo, for which they advanced according to agreement, wrote to *W. & S.* that they would find employment for the vessel, or ship a return cargo. *L. & Co.* accordingly put on board a cargo shipped on the account and risk of *W. & S.* and bills of lading were signed by the master, deliverable to *W. & S.*, to whom the goods were charged in account by *L. & Co.* Previously to the shipping of the return cargo, *W. & S.* had executed a writing or bill of sale to plaintiffs, purporting to convey all the cargo then on board the ship of *W. & S.*, then on the voyage to *Liverpool* and back to *U. S.* The vessel being detained by contrary winds, after the shipment, *L. & Co.* heard of the failure of *W. & S.*, and thereupon, by threatening to stop the vessel if he refused, prevailed upon the master to give up the bills of lading already signed, (excepting one, which, on his return, he delivered to *W. & S.*, who endorsed it to the plaintiffs,) and to sign other bills of lading deliverable to the defendant or his assigns, being the agent of *L. & Co.*; held, in replevin for the goods, that the defendant must prevail, because *L. & Co.* had so far a control over the goods, after they had been put on board, and the first set of bills of lading had been signed, as that they might lawfully alter their destination, or they migʰ

6 *　　　　　　　　　　　　　　　65

at least stop them in their transit; and that, if the bill of sale to the plaintiff's could, in any event, operate to pass the property in the return cargo, it must be subject to the rights of *L. & Co.* — ED.]

THIS was a replevin of a quantity of salt and coals. Issue being taken upon the question of the property of the plaintiffs in the articles replevied, the same was tried at the last October term in this county, before *Thatcher, J.*, and a verdict found by consent for the defendant, subject to the opinion of the Court upon the evidence reported by the judge who sat in the trial.

To maintain the issue on their part, the plaintiffs relied on a bill of sale from *Lemuel Weeks*, and *W. C. Weeks*, his son, dated the 8th of January, 1808, at *Portland*, expressed to be for the consideration of 3000 dollars, and purporting to convey to the plaintiffs, "all and singular the contents of the cargo *now on board* of the ship *Henry*, of *Portland, Joseph Weeks* master, now on a voyage to *Liverpool*, and back to the *United States*," — and also on a bill of lading executed by the said *Joseph Weeks*, as master of the ship *Henry*, at *Liverpool*, on the 27th of January, 1808, by which he acknowledges the shipment and receipt of the salt and coals in question on board the said ship, to be delivered at *Portland*, unto Messrs. *Weeks & Son*, or their assigns, and which bill of lading was endorsed by Messrs. *Weeks & Son* to the plaintiffs on the 22d of March, 1808.

[ * 66 ]    * The plaintiffs also produced in evidence an agreement made between *Logan, Lenox, & Co.*, and *Weeks & Son*, dated the 4th of November, 1807, stating the terms on which the former receive consignments and make insurance when directed by their correspondents, and limiting the draughts of the latter to the estimated value of their consignments. Also a letter from *Logan, Lenox, & Co.*, to *Weeks & Son*, dated at *Liverpool*, December 28, 1807, announcing the arrival of the ship *Henry*, and undertaking to procure employment for her, if practicable, and if not, to despatch her immediately with a cargo of salt. Likewise the copy of an account current of *Logan, Lenox, & Co.*, with *Weeks & Son*, in which, under date of January 26, 1808, the former charge the latter with a cargo of salt and coals shipped by the *Henry*, and credit them with the proceeds of the outward cargo of the same ship, which account had been produced before certain arbitrators between *Logan, Lenox, & Co.*, and a Mr. *M'Lellan*, but, as one of the arbitrators testified, not as showing the state of the existing demands between the parties to the account, nor did it appear that it had ever been rendered as such to *Weeks & Son*.

On the other hand, the defendant relied on another bill of lading affirmed to by the same master of the ship *Henry*, at *Liverpool*, on

the 10th of February, 1808, by which the same shipment of the salt and coals is stated to be " on the proper account and risk of citizens of the *United States*, to be delivered at *Boston* unto Mr. *Peter Stubbs* or his assigns, freight for the same being paid."

The shipment in question is in both instances stated to have been made by *Logan, Lenox, & Co.*, and the origin of these contradictory bills of lading was explained by the testimony of *Joseph Weeks*, the master of the ship. In his deposition, he relates his voyage in the *Henry* for account of his owners, *Weeks & Son*, from *Bath* to *Liverpool*, consigned to *Logan, Lenox, & Co.*, with a cargo, which he delivered there; their shipment afterwards of the salt and * coals for the account of his owners, and consigned to   [ * 67 ] them, for which he affirmed to the first bills of lading; and that, during a detention at *Liverpool* by contrary winds, a requisition was made upon him by *Logan, Lenox, & Co.*, in consequence of intelligence they had received of the failure of his owners, to have those bills of lading given up and others substituted, threatening to detain the ship if this was refused. With this requisition he thought himself under a necessity of complying, and accordingly signed the second bills of lading, and received Mr. *Stubbs*, the present defendant, the consignee named in the second bills, and one of the firm of *Logan, Lenox, & Co.*, as a passenger, who came out for the purpose of having the possession and control of the cargo. After their arrival at *Portland, Joseph Weeks*, the master, gave one of the bills of the first set, which he had retained, to *Weeks & Son*, his owners, who endorsed it to the plaintiffs as aforesaid.

*Whitman* for the plaintiffs.

*Mellen* and *Emery* for the defendant.

SEWALL, J. The general question to be decided in this case is, Does the evidence establish the property of this cargo in the plaintiffs, claiming it under the bill of sale executed at *Portland* on the 8th of January, 1808?

As to the effect of the bill of sale, restricting its operation to the words of it, there would be no question. For literally taken, the cargo claimed under it had no existence at the time of the bargain and transfer, under which the plaintiffs claim. But this is not the construction to be put upon a contract of this kind. As between *Weeks & Son* and the plaintiffs, the bill of sale undoubtedly gave the latter a right to take to their own use whatever articles did or should constitute the homeward cargo of the ship *Henry*, when she should return from the voyage in which she was then engaged; that is, such lading as she should have, which, independently of the bill of sale, would have been the property of the owners

[ \* 68 ] of the vessel — a sense latterly, \* and not incorrectly, given to the term *cargo*, as exclusive of any other lading, or goods taken on freight. The bill of sale may be considered as establishing an unquestionable claim and right against them, or any interest they might have in a cargo afterwards arriving in the ship *Henry* from *Liverpool.* (*a*)

When, however, the question of property is with third persons, it may be necessary to examine the case with more strictness. And in deciding between parties, whose interests are not distinguishable in equity, the question may ultimately turn upon the nicest formalities of legal title.

Strictly speaking, then, the contract between *Weeks & Son* and the plaintiffs gave them but a *chose in'action,* and was *rather a covenant than a sale.* (*b*) As transferring an expectation or demand against the correspondents of *Weeks & Son,* their factors at *Liverpool,* the vendors of the cargo to be shipped there, the bill of sale must be considered subject to all the rights and duties of the original parties to the shipment, when it should be made ; the shippers and master acting without notice of the transfer at *Portland.* The rights of the shippers or vendors of the cargo are not to be affected by the bill of sale ; and the property acquired by it is not to be carried beyond the legal demands of *Weeks & Son,* or their rights in the property in question, against the firm of *Logan, Lenox, & Co.* The defendant in this action represents them ; and all their rights, opposed to the claim of the plaintiffs, are to be allowed to him.

In this view of the case, the other circumstances and facts in evidence became material to the decision.

The agreement made for *Logan, Lenox, & Co.,* with *Weeks & Son,* dated November 4, 1807, which may be considered as resulting in the consignment of the ship *Henry* to them, if relied on for the plaintiffs as evidence of any contract to send them return cargoes for vessels consigned to the house of *Logan, Lenox,* [ \* 69 ] *& Co.,* is very deficient \* in that respect, and not at all suitable to the purpose. It not only expressly negatives any intention of advancing for consignments, but it contains no stipulation, engaging them absolutely to the purchase of return cargoes, even when supplied with funds. But what is more material, the *Henry* was not consigned to them for the purpose of obtaining a return cargo. To the extent of her outward cargo, or, as it proved, much exceeding the proceeds of it, had been drawn and

(*a*) [Vide *Robinson* vs. *M'Donnell,* 5 *Maule & Selw.* 236, and 1 *Leon.* 42. — *Hob.* 132 — ED.]

(*b*) [How can this be reconciled with what is advanced in the sentence just above ? — ED.]

accepted; and the vessel was placed entirely in the control of *Logan, Lenox, & Co.*, to be employed by them on a freight or charter party, if to be obtained; and a cargo of salt was only to be resorted to, if nothing better could be done.

The testimony of the master was, that he had no power to dispose of either ship or cargo, but was to follow the orders of *Logan, Lenox, & Co.*, in all things concerning the voyage; and in their letter, under date of December 28, 1807, after the arrival of the *Henry* at *Liverpool*, they undertake to get a charter for the vessel, if possible, and only to send a cargo of salt, if nothing better could be done. Until the departure of the vessel, therefore, she continued under their control, and the cargo was subject to their orders. And their power was not determined by a shipment intended for *Weeks & Son*, if afterwards a shipment for some other account, or upon a charter or freight, appeared to them advisable. The first bills of lading were evidence of an intention, which, until the departure of the vessel, *Logan, Lenox, & Co.*, had authority to reconsider and reverse; and this authority they exercised in cancelling them, and substituting other bills of lading, which placed the articles of the cargo on freight, instead of being on account of the owners of the ship. Their authority in this respect was not impaired, nor was the determination on their part unjust or improper; because it became necessary as a measure for their own security, upon an intended advancement, after the credit of *Weeks & Son* had become doubtful.

* Besides, the first bills were cancelled with the consent [ * 70 ] of the master — a consent in which he was entirely justified, being conformable to the duties of his owners and employers. This was a restoration of property, which they could not, with any sense of justice, insist upon retaining, at the certain expense and loss of their correspondents. (c)

If under similar circumstances, and at the instance of *Logan, Lenox, & Co.*, and their threatening to stop the vessel by virtue of their control and authority over the voyage, the master had relanded his cargo, and returned empty, is it possible to conceive that the bill of sale at *Portland* would have given a right of action to the plaintiffs against *Logan, Lenox, & Co.*, for the value of the cargo shipped, or intended to be shipped, but finally restored, for the best of all reasons, *viz.*, that the purchasers, those to whom it was going

(c) [*Quære*, if the merchandise had been once completely delivered on board the ship of the vendee, shipped on his account and risk, and the bill of lading had been signed, deliverable to him, what authority had the master and the vendor, under any instructions given to either of them, to rescind the contract, and unlade the cargo ? — *Groving & Al.* vs. *Mendam*, 5 *Maule & Selw.* 189. — *Summeril* vs. *Elder*, 1 *Binn.* 106. — *Inglis* vs. *Usherwood*, 1 *East*, 515. — *Sweet* vs. *Pym*, *ib.* 4 · Ed.]

on credit, had no ability of paying for it, if they should take it? — And how does the reversal of the bills of lading differ materially from the case supposed?

If this reasoning is correct, there is no occasion of resorting in this case to the doctrine of stoppage *in transitu.* For *Weeks & Son,* as consignees, or for their assigns under the bill of lading, there never was a cargo in the ship *Henry in transitu;* the authority of *Logan, Lenox, & Co.,* to reverse their intention, and their doing this, and substituting the second bills of lading, was tantamount to a restoration of the property intended to be shipped for *Weeks & Son;* and it must be considered as shipped from the beginning for another account. Their authority to demand a restoration, and that of the master to consent to it, were not restricted by the contract with the plaintiffs, unknown to those who were acting at *Liverpool* under an apprehension of an important change in the circumstances of *Weeks & Son,* which proved to be well founded. This becoming known to their correspondents, seasonably to enable them to provide for their own security, the provision was made, and was justifiable upon the principles of good faith and [ * 71 ] * mercantile honor; and was, I think, legally effectual against the claim of the plaintiffs.

As a question of fact upon the whole evidence, whether the shipment for the account of *Weeks & Son* had been finally cancelled, or was only colorably changed, some doubt might be excited from the circumstance of the account produced by one of the firm of *Logan, Lenox, & Co.,* at the reference between them and a third party, containing the charges of the salt and coals to *Weeks & Son.* But this doubt is removed by the testimony of the same witness, of the manner' in which that account was obtained, and the actual state of it as a memorandum only; and that it had never constituted an account rendered, and had never been offered as an existing demand. And although this might be a question rather for the jury than the Court, yet, in the actual state of the evidence, a conclusion upon it for the defendant must be the only correct result, so far as the case is affected by that circumstance.

With the aid, however, of the doctrine of stoppage *in transitu,* the question in this case may be more conclusively, and with some, more satisfactorily, decided. According to this rule of the law merchant, which has become ingrafted with the common law, the shipper or consignor of goods, sent upon a general or particular credit, as upon an order for a return cargo, when there is no specification, or a specific order and purchase of the articles shipped, has a right, in the event of an actual failure of the consignee or purchaser, to countermand the delivery, and cause them to be delivered

to himself or to some other for his use ; and this right ceases only with the *transitus* or passage of the goods, upon an actual or constructive delivery thereof to the consignee himself.

A foreign merchant, who, for a commission only to himself, purchases upon his own credit, and ships upon the credit which he gives to his employer, is a consignor or vendor entitled to the bene- . fit of this rule.    Nor is the application of the rule to be restricted to those cases, where the contract * of sale, as   [ * 72 ] between the consignor and consignee, is to be considered executory ;  as where the consignee or vendee has not obtained upon the credit afforded him, what is, by the principles of the common law, a vested property.    On the contrary, this is supposed ;  and the restrictions upon the exercise of this right, established by *English* decisions, have been derived from mercantile usages, sanctioned by their expediency, and by principles of public policy, or by the precautions suggested by the system of the bankrupt laws.    In itself,  · and as determining a question of right between the parties to the contract of sale, the rule is perfectly equitable and just, in every case of the actual insolvency of the consignee ; and it has been allowed to be exercised, even where a part of the price had been paid, or a bill of exchange for it accepted and endorsed over to a third person. (1)

When it is that the *transitus* is at an end, and a delivery has taken place, has been a question of some difficulty in particular cases.    By one decision, goods have been considered *in transitu*, notwithstanding a delivery to the master of a ship chartered solely by the consignee.    In another case, where the goods attempted to be reclaimed had been delivered to the master of a ship chartered solely by the vendee for a term of years, and were put on board thereof, destined by him on a particular adventure, for which they had been purchased, it was holden that the vendor could not stop them.    The distinction in these two cases, upon which these different decisions rest, is, as I apprehend, the circumstance of the ultimate destination of the consignment ; for, in both cases, the consignee was the owner of the vessel ; in one case, for the term of years ; in the other case, for the voyage ; so that this was not the ground of decision, as *Abbott*, in citing the cases, seems to suppose ; (*d*) but, in the one case,

(1). *Abbott on Shipping*, c. 9, p. 357, *Amer. edit.* — 3 *East.* 93. — 1 *H. Black.* 365, note *a.* — 6 *East.* 27, 28. — 7 *D. & E.* 440.

(*d*) [With due deference to the opinion of the Court, it is submitted that the ground of the decisions referred to is correctly stated by *Abbott.*   In *Stubbs* vs. *Lund*, (7 *Mass. Rep.* 453,) a case arising from the same transactions, and depending nearly upon the same facts, it is true Chief Justice *Parsons*, in delivering the opinion of the Court, is reported to have said, " The true distinction is whether any actual possession of the consignee, or his assigns, after the termination of the voyage, be or be not provided for in the bill of lading.   When such actual possession, after the termination of the voyage

the goods had reached the constructive possession of the owner, the *transitus* was at an end, and the further direction of the goods had been determined by the vendee ; whereas, in the other case,

[ * 73 ]　the *transitus* continued, * the goods had not arrived to the possession of the owner, actual or constructive, considered as a termination of their passage from the vendor to the vendee. (2)

In the case at bar, the consignee was the owner of the vessel, on board of which the articles, the property whereof is in question, were laden. And it is to be supposed, in making this question, that they had been delivered to the agent of the consignee for his account and risk ; but the delivery was for the purpose of carriage to him, and the vessel itself, and the master, at the time the delivery was countermanded, were still under the direction of the consignor. The goods constituted a cargo on its passage to the vendee, to give the fullest effect to the first bills of lading that can be contended for. The right to stop them, therefore, proving the actual failure of the consignee, seems to result from a reasonable construction and

is so provided for, there the right of stopping *in transitu* remains after the shipment. Thus, if goods are consigned on credit, and delivered on board a ship, chartered by the consignee, to be imported by him, the right of stopping *in transitu* continues after the shipment; but if the goods are not to be imported by the consignee, but to be transported from the place of shipment to a foreign market, the right of stoppage *in transitu* ceases on the shipment; the transit being then completed, because no other actual possession of the goods by the consignee is provided for in the bills of lading, which express the terms of the shipment. The same rule must govern if the consignee be the ship owner. If the goods are delivered on board his ship to be carried to him, an actual possession by him, after the delivery, is provided for by the terms of the shipment; but if the goods are put on board his ship to be transported to a foreign market, he has on the shipment all the possession contemplated in the bills of lading. In the former case, the transit continues until the termination of the voyage; but in the latter case, the transit ends on the shipment." But it is believed no such doctrines or distinctions are recognized by the law relative to this subject. If the consignee be owner of the ship, either entirely, or for a term of years, or *pro tempore* only, a delivery on board the ship is equivalent to a delivery into the warehouse of the consignee. As ships are chartered upon various terms. it often becomes a difficult matter to determine who, for the time being, is to be considered as the owner; and some of the cases have turned wholly upon this question. But, generally, if the goods have been delivered into the actual or constructive possession of the vendee, the *transitus* has been held to be at an end. Instead of its being a general rule that goods are liable to stoppage after a delivery *merely constructive*, the general rule seems to be exactly the reverse, and it is merely an exception to the general rule, that goods are liable to stoppage after a constructive delivery to " a middle man," *a carrier for the purposes of transpor tation.* — *Holt on Shipping*, 502, 3. — *Brown on Sales*, p. 446, 501, 507. — *Ruck* vs. *Hatfield*, 5 B. & A. 632. — *Noble* vs. *Adams*, 7 *Taunt.* 59. — 2 *Marsh.* 366. In the principal case, the consignees were the owners of the ship, and had the control of her, so far as they had not given it up to the consignors, as their agents. The delivery on board to the captain in the employ of the consignees, for their account and risk, under the circumstances, was a constructive delivery to them, unless the vessel and master, at and after the delivery, were under the control of the consignors as agents of the consignees, so as to make this differ from the common case of a delivery on board the ship of the vendee. And it is submitted that, although the consignors had authority to find employment for the ship, yet their agency terminated upon delivering the cargo on board. — ED.]

(2) 7 *Mass. Rep.* 453. — *Stubbs* vs. *Lund.*

application of the rule on this subject; and both the right and the exercise of it are, in our opinion, established by the whole evidence, not only against any claim of the consignee, but also against the claim of his assigns, under the deed to them, made prospectively, and, in fact, before the shipment; for which the consignor was not engaged by any previous promise or consideration. The assignment relied on for the plaintiffs is not of a bill of lading in the possession of the consignee; and the case is not, therefore, to be decided by the usage found by the jury in the ultimate decision of the case of *Lickbarrow* vs. *Mason;* (3) if, indeed, a similar usage within this state is provable in any case. (c)

Upon the whole, the opinion of the Court is in favor of the defendant; and judgment is to be entered upon the verdict taken for him, for a return of the articles replevied, with his damages and costs.

(3) 5 *D & E.* 686. — 1 *B. & P.* 563.
(e) [Vide *Brain* vs. *Harder*, 2 *Cur. & P.* 52. — *Davis* vs. *Reynolds*, 4 *Cowp.* 267. — *Barton* vs. *Boddington*, 1 *Cur. & P.* 207. — *Hawes* vs. *Watson*, 2 *Barn. & Cres.* 540. — *Eden. P. L.* 317. — *Selw. N. P.* 1224. — *Coates* vs. *Railton*, 6 *B. & C.* 422. — ED.]