ALBERT NEWHALL & al. *Administrators of* SAMUEL
WINTER'S *Estate vs.* JOSEPH VARGAS.

Where goods are sold on credit at a foreign port and shipped on board a vessel
of the vendee, consigned to him, and to be delivered to him at his port of res-
idence; and the consignee becomes insolvent before payment is made; the
vendor has the right to stop the goods in their transit at any time before they
shall come into the actual possession of the vendee.

The right to stop the goods *in transitu* is not divested by the purchase of the
goods of others by the vendor on his own credit for the vendee.

Nor by the vendor's taking bills of exchange drawn in his favour by the master
of the vessel on the vendee.

Nor by charging a commission for doing the business.

Nor does the reception by the vendee of part payment take away the right.

A claim made by the vendor on any person having charge of the goods, before
the transit ends, is a sufficient exercise of the right of stoppage to revest the
goods.

To prevent the enforcement of this right, it is not sufficient for the consignee to
make his claim to the goods; he must obtain the actual possession.

To entitle himself to exercise his right of stoppage, the vendor is under no obli-
gation to refund what he may have received in part payment; nor to pay the
value of the freight.

THIS case came before the Court on a statement of facts, of
which such are given, as are necessary for the proper understand-
ing of the questions of law raised on the argument.

The action was replevin brought by the plaintiffs, as adminis-
trators of the estate of *Samuel Winter*, for a quantity of molas-
ses, the cargo of the barque *William Smith*, imported into *Port-
land* from *Havana* in the island of *Cuba*, in *September*, 1835;
of which barque *Levi Peterson* was master, and said *Samuel
Winter* sole owner. Said barque arrived at *Matanzas* in said
island in *August*, 1835, consigned to *N. Cross, Jr.* as the agent
of *Winter*, who directed the master to proceed with the barque
to *Havana* and consign her to *Joseph Vargas*, the defendant, a
merchant at *Havana;* and the said *Vargas* on her arrival at that
place received the consignment and sold the cargo, consisting of
lumber, and received the net proceeds thereof, amounting to the
sum of $3740,50, which were invested in the return cargo. In
conformity to the directions of said master, the said *Vargas* pur-
chased for and furnished him with a full return cargo of molasses,
amounting in value to $13513,62. *Vargas* made sundry dis-

bursements for said barque amounting to $352,56, and paid the master $221,00 for other disbursements for the barque. For the balance of the account of the barque, the said master made, executed and delivered to the said *Vargas* five bills of exchange, drawn on said *Winter* by the master for value received, and made payable to said *Vargas* or his order at sixty days sight, amounting in all, to the sum of $10296,62; of which two were dated *September* 1, 1835; two others were dated *September* 3, 1835, and the other, *September* 4, 1835, all of which were made payable in the city of *New York*. *Peterson*, the master, sailed with his return cargo on the 6th of the same *September*, before which time said *Vargas* had negotiated said bills of exchange at *Havana*, charging *Winter* a commission of one and half per cent. therefor; and they were sent to the *United States* in the usual course of business. About one month after the sailing of said barque, news reached *Havana* of the death and insolvency of *Winter*; and thereupon the said *Joseph Vargas* sent his brother, *Nicholas Vargas*, to the *United States*, clothed with full power to act for him in relation to his claims arising out of his transactions with *Winter*, and arrived in the city of *New York* on the fourth of *November* following, and there found, that all of said bills of exchange had been protested for non acceptance; and immediately proceeded to *Boston* and from thence to *Portland*, where he arrived on the 15th of the same *November*; and soon after his arrival there and during his stay at *Portland*, said bills fell due and were protested for non payment; and the same were taken up and paid by *W. W. Russell* of *New York* for the honour and on the account of the said *Joseph Vargas*. Prior to the arrival of the said *Nicholas* in *Portland*, and in the month of *September*, *J. B. Thompson*, one of the partners of the mercantile house of *Fessenden, Thompson & Co.* of *Boston*, the general correspondents of the defendant in the latter city, and claiming to act as their agents, proceeded to *Portland* and employed one *Merrill* to act in his behalf, who received written instructions. In conformity to these instructions said *Merrill*, on the morning of the 28th of *September*, having been informed of the arrival of said barque in the lower harbour of *Portland*, proceeded on board, and there demanded of the mate then in charge of the barque,

the captain being on shore, the cargo of the same in the name and in behalf of the said *Joseph Vargas*, as his property, in consequence of the death and insolvency of said *Winter*, and forbid the delivery of said cargo to the representatives of said *Winter*, or to any others on his account. Said *Merrill* remained on board until the return of the master, and immediately on his coming on board demanded of the master the said cargo, and forbid him to deliver it to said *Winter's* representatives, or to any person in said *Winter's* behalf; and said master refused to deliver up the same, claiming to hold it for his own indemnity, or to do any act without the advice of counsel. During said *Merrill's* stay on board, an officer of the customs came and demanded said vessel's papers and left an inspector on board. Said *Merrill* then left the vessel, and on the day following demanded the cargo of the collector of *Portland*, and notified him of the previous demands on the master and mate. About four days after the arrival of the barque at *Portland* a keeper was put on board at the request of *Fessenden, Thompson & Co.* and in behalf of said *Joseph Vargas*, and of said *Peterson*, the master, who claimed an interest in the cargo, as an indemnity against said bills, and the keeper remained on board until the collector of *Portland* took the vessel into his possession. All of which proceedings of said *Fessenden, Thompson & Co.* and of those employed by them, were sanctioned and ratified by the said *Nicholas*, the attorney of said *Joseph Vargas*, on his arrival in *Portland*, and in behalf of said *Joseph*. This ratification took place several weeks before this suit was commenced. Before the commencement of the suit, said *Nicholas*, in behalf of the defendant, tendered the collector the amount of the duties due on the cargo and claimed the right of entering the same, as the property of said *Joseph Vargas*. At the time of the delivery of the cargo at *Havana*, an invoice thereof, and the amount of sales, purchases, disbursements and commissions were delivered to the master, and a letter was addressed to said *Winter* covering a bill of lading of the cargo, and forwarded, informing him, that said cargo had been furnished to the captain by said *Vargas*, and was consigned to said *Winter* to be delivered to him at *Portland*. Said *Peterson* was notified, as drawer of said bills of exchange in the ordinary course of business, and the defend-

ant holds him liable for said bills, in default of payment or dis-
charge in some other mode. *Peterson*, the master, and the ad-
ministrators of *Winter*, claimed the right to enter the cargo at the
custom house ; but the collector declined to decide on the con-
flicting claims, and after the expiration of fifteen days from the
arrival of the barque, took the cargo out and stored the same in
the government stores. Before the cargo was sold for the pay-
ment of duties, said *Nicholas Vargas*, as attorney of the defend-
ant, paid the duties and was permitted to enter the cargo and
take possession thereof. Afterwards, the administrators of *Win-
ter* repaid to the agent of the defendant the duties on the cargo,
under an agreement, that it should be without prejudice to the
rights of either party. The orders from *Winter* to the master to
obtain a full return cargo were verbal. On the passage home,
from badness of weather, about one hundred hogsheads of the
molasses were lost. The administrators of *Winter* on receiving
the bills of lading and letter of advice, and sometime before the
arrival of *Nicholas Vargas*, proceded immediately to call on the
master for the papers for the purpose of entering said vessel and
cargo, and they paid off and discharged the mate and crew.

Judgment was to be entered for the plaintiff or defendant ac-
cording to law, with costs according to law.

The case was very strenuously and fully argued by

*Preble* and *Daveis*, for the plaintiffs, and by

*Mellen* and *Deblois*, for the defendant, at an adjournment of
the regular term of the Court.

In the complete discharge of duty to clients, the counsel found
it necessary to continue their arguments, though with much vari-
ation as to the time consumed by each, during two whole days ;
and the authorities cited are exceedingly numerous. To give
even a sketch of the arguments would require more space than
can be devoted to any one case ; and therefore nothing more will
be attempted, then to state some of the positions taken, and to
give a list of authorities cited.

*Daveis.*

*Vargas* has no right to assume the character of vendor of the
cargo, and in that capacity to set up the right to stop it *in tran-*

*situ.* By charging a commission on the negotiation of the bills, he may and should be considered as having sold them on *Winter's* account, and as having paid himself with the money. His after claim on the bills was obtained in the character of indorser, not as payee. Or the commission may be considered, as his compensation for a guaranty of the debt.

His character of vendor is discharged by taking the bills of exchange of *Peterson,* a third person, drawn on *Winter,* and holding *Peterson* accountable on them. This extinguishes all right of lien. In *Maine* and *Massachusetts* the transaction amounts to a payment. *Peterson's* being *Winter's* agent makes no difference.

But if *Vargas* can be considered as vendor, still the delivery of the cargo to *Peterson,* the agent of *Winter,* the vendee and consignee, on board *Winter's* vessel, was a delivery to *Winter* himself. This destroys all right of lien, and takes away all power to stop the goods *in transitu.*

With the exception of one case, *Stubbs* v. *Lund,* 7 *Mass. R.* 453, there is little conflict in the cases on this subject. That case was rightly decided on the facts. The majority of the court aided in deciding the case of *Illsley* v. *Stubbs,* 9 *Mass. R.* 65, and one of them delivered the opinion. The facts in the two cases are the same, and the true reasons are given in the latter case. If the Reporter's note is to be considered the true expression of the substance of the decision in *Stubbs* v. *Lund,* it is expressly overruled in *Pennsylvania,* and opposed to the main current of authorities bearing on the point.

The case shews, that a large portion of the cargo was purchased with *Winter's* own funds, the proceeds of the outward cargo; and that the property was brought home in *Winter's* vessel. If the right claimed had existed, it could not have been exercised until payment or tender of payment of these sums.

If *Vargas* had the right, it was not seasonably exercised in this case. This was no part of the duty of mere general correspondents. Before any ratification of their acts by *Vargas,* the administrators had asserted their rights.

*Mr. Daveis* cited the following authorities, and commented on many of them. Some of them were cited for the purpose of

pointing out the true principle of the decision ; or of opposing others to them in which they were overruled ; or of showing their want of pertinency to the present case.

*Holt on Maritime Contracts,* 499 ; *Lawes on Charter parties,* 415 ; *Sweet* v. *Pym,* 1 *East,* 4 ; *Feise* v. *Wray,* 3 *East,* 100 ; *Siffken* v. *Wray,* 6 *East,* 371 ; *Rowley* v. *Bigelow,* 12 *Pick.* 313 ; *Haille* v. *Smith,* 1 *Bos. & Pul.* 563 ; *Wiseman* v. *Vandeput,* 2 *Vernon,* 203 ; *Snee* v. *Prescott,* 1 *Atk.* 249 ; *Gilman* v. *Brown,* 1 *Mason,* 191 ; *Garson* v. *Green,* 1 *Johns. Ch. C.* 308 ; 4 *Kent,* 2d *Ed.* 151, 514 ; *Mackrath* v. *Symmons,* 15 *Ves.* 329 ; *The Constantia,* 6 *Rob. Adm. Rep.* 321 ; *Montagu on Lien,* 86 to 100 ; *Barrett* v. *Goddard,* 3 *Mason,* 107 ; *Abbott on Shipping,* 4th *Ed.* 365 ; *Lickbarrow* v. *Mason,* 2 *T. R.* 63 ; *Same case,* 1 *H. Bl.* 366 ; *Descadillas* v. *Harris,* 8 *Greenl.* 298 ; *Mayhew* v. *Prince,* 11 *Mass. R.* 54 ; *Grosvenor* v. *Stone,* 8 *Pick.* 79 ; *Scott* v. *McLellan,* 2 *Greenl.* 199 ; *Newsom* v. *Thornton,* 6 *East,* 16 ; *Illsley* v. *Stubbs,* 9 *Mass. R.* 65 ; *Atkin* v. *Barwick,* 1 *Strange,* 165 ; *Harman* v. *Fishar, Cowper,* 117 ; *Richardson* v. *Goss,* 3 *B. & P.* 124 ; *Scholfield* v. *Bell,* 14 *Mass. R.* 40 ; *Inglis* v. *Usherwood,* 1 *East,* 515 ; *Coates* v. *Railton,* 6 *B. & Cres.* 422 ; *Dixon* v. *Baldwin,* 5 *East,* 180 ; *Oppenheim* v. *Russell,* 3 *B. & P.* 42 ; *Bohtlingk* v. *Inglis,* 3 *East,* 381 ; *Stoveld* v. *Hughes,* 14 *East,* 312 ; *Scott* v. *Pettit,* 3 *B. & P.* 469 ; *Leeds* v. *Wright,* 3 *B. & P.* 320 ; *Rowe* v. *Pickford,* 8 *Taunt.* 83 ; *Harman* v. *Anderson,* 2 *Camp.* 243 ; *Noble* v. *Adams,* 7 *Taunt.* 25 ; 2 *Kent's Com.* 2d *Ed.* 347, 547, 422 ; *Mills* v. *Ball,* 2 *B. & P.* 457 ; *Foster* v. *Frampton,* 6 *B. & Cres.* 107 ; *Fowler* v. *McTaggart, cited in* 7 *T. R.* 442, *cited as Fowler* v. *Kymer,* 3 *East,* 396 ; *Salomans* v. *Nissen,* 2 *T. R.* 674 ; *Coxe* v. *Harden,* 4 *East,* 211 ; *The Spartan,* 3 *Amer. Jurist,* 32 ; *The Volunteer,* 1 *Sumner,* 551 ; *Bolin* v. *Huffnagle,* 1 *Rawle,* 1 ; *Fearon* v. *Bowers, cited in* 1 *H. Bl.* 364 ; *Cowing* v. *Snow,* 11 *Mass.* 415 ; *Pickman* v. *Woods,* 6 *Pick.* 252 ; *Portland Bank* v. *Stubbs,* 6 *Mass. R.* 422 ; *Caldwell* v. *Ball,* 1 *T. R.* 205 ; *Crashaw* v. *Edes,* 1 *B. & P.* 181 ; *Savignae* v. *Cuff, cited in* 2 *T. R.* 66 ; *Hodgson* v. *Loy,* 7 *T. R.* 436 ; *Kinlock* v. *Craig,* 3 *T. R.* 119 ; *Fenton* v. *Pearson,* 15 *East,* 419 ; *Ellis* v. *Hunt,* 7 *T. R.* 464 ; *Wright* v. *Lawes,*

4 *Esp. R.* 82; *Hammond* v. *Anderson*, 4 *B. & P. or* 1 *New Repts.* 69; *Fettyplace* v. *Dutch*, 13 *Pick.* 388; *Hurry* v. *Mangles*, 1 *Camp.* 452; *Holt* v. *Pownal*, 1 *Esp. R.* 240; 13 *Martin's Louis. Repts.* 261.

*Preble* cited in addition, 2 *B. & Ald.* 511; *Thompson* v. *Snow*, 4 *Greenl.* 264; *Emery* v. *Hersey*, *ibid.* 407.

*Deblois.*

These facts appear in the statement. 1. The cargo of the barque was the property of the defendant, *Joseph Vargas*, and he sold it on a credit to *Winter*. 2. It was shipped on board the barque, then belonging to *Winter*, of *Portland*, consigned to him and to be delivered to him or his assigns at that place, on his own account and risk. 3. *Winter* died insolvent before the vessel arrived at *Portland*. 4. The bills of exchange, drawn by the captain on *Winter* in payment of the cargo, were protested for non-acceptance, and afterwards taken up by *Vargas*. 5. The cargo remained on board the vessel in *Portland* harbor, in possession of the captain, until the Collector of the customs took possession of the same and stored it; and no part of the cargo ever came into the possession of the plaintiffs, till they obtained the possession from *Vargas* by means of their writ of replevin. On these facts what is the law?

Although the doctrine of stoppage *in transitu* was first enforced by Courts of Chancery, the Courts of law have adopted it, and now favor it; as the following cases will shew. *Lickbarrow* v. *Mason*, 2 *T. R.* 63; *Hammond* v. *Anderson*, 1 *New Repts.* 69; *Northey* v. *Field*, 2 *Esp. R.* 613; *Hodgson* v. *Loy*, 7 *T. R.* 440; *Illsley* v. *Stubbs*, 9 *Mass. R.* 72; 2 *Wheat. Ed. of Selwyn's N. P.* 443; 2 *Kent's Com. 2d Ed.* 551; *Abbott on Shipping*, 4th *Ed.* 364; *Holt on Mar. Con.* 496.

The main principle, on which the whole case turns, will be stated in the words of Chief Justice *Parsons*.

" The right of stopping all goods shipped on the credit and risk of the consignee remains until they come into his actual possession at the termination of the voyage, unless he shall have previously sold them, *bona fide*, and indorsed over the bill of lading to the purchaser." *Stubbs* v. *Lund*, 7 *Mass. R.* 457.

Newhall *v.* Vargas.

That case is supported by many others of the highest authority, among which are the following. *Illsley* v. *Stubbs,* 9 *Mass. R.* 65 ; *Feise* v. *Wray,* 3 *East,* 93 ; *Wiseman* v. *Vandeput,* 2 *Vernon,* 203 ; *Hodgson* v. *Loy,* 7 *T. R.* 440 ; *Bohtlingk* v. *Inglis,* 3 *East,* 381 ; *Inglis* v. *Usherwood,* 1 *East,* 505 ; 2 *Kent,* 2*d Ed.* 551 ; *Naylor* v. *Dennie,* 8 *Pick.* 198 ; *Ellis* v. *Hunt,* 3 *T. R.* 564.

This is the general rule. There are exceptions to it, which however do but confirm it. Our case is not within any of the exceptions.

These are, 1. Where there has been an assignment of the bill of lading, and the rights of third persons have intervened. As in *Lickbarrow* v. *Mason,* 2 *T. R.* 63.

2. Where a partial delivery has taken place. As in *Slubey* v. *Heyward,* 2 *H. Bl.* 504 ; *Hammond* v. *Anderson,* 1 *New Repts.* 69.

3. Where the cargo has been delivered to some *special agent of the consignee.* As in *Leeds* v. *Wright,* 4 *Esp. R.* 243 ; *same case,* 3 *B. & P.* 320 ; *Scott* v. *Pettit, ibid,* 469 ; *Dixon* v. *Baldwin,* 5 *East,* 175.

And a delivery to the master of a vessel is not a delivery to a special agent, so as to come within the exception. *Ellis* v. *Hunt,* 3 *T. R.* 464.

4. Where the cargo is not intended to come to the port where the vendee resides, but is sent from the place of purchase directly to another market. Such was the case so much relied on by the counsel on the other side. *Fowler* v. *McTaggart,* and other cases cited.

With these exceptions, under none of which does this case fall, there is but little conflict, it is agreed in the decisions. They are all in unison with *Stubbs* v. *Lund,* or perfectly reconcilable with it, but in the solitary instance of the case from 1 *Rawle,* 1. There the court were divided three to two, and the opinion of the minority is based on sounder reasons and cites higher authority, than that of the majority. *Chancellor Kent,* in a note to *vol.* 2, 3*d Ed.* 544, considers the majority of the court wrong, and that *Stubbs* v. *Lund,* was rightly decided. So high an

authority, as *Chancellor Kent,* far outweighs any balance against us from the case in *Rawle.*

With respect to the numerous cases cited in relation to transportation by land carriage, it is enough to say, that they have no bearing on this case. The law in that respect has adopted different rules from those settled in regard to transportation by water from one country to another.

If a delivery to the master of a vessel is to be considered a delivery to the owner, as contended for in behalf of the plaintiffs, then the right of stoppage *in transitu* is useless. The cargo purchased on credit is usually put immediately on board a vessel under charge of the captain.

*Vargas* has done nothing in this case to destroy his exercise of this right.

In drawing the bills of exchange *Peterson* acted, as the mere servant of his owner, and afterwards his acts were sanctioned by *Winter.* The claim now made for the property ratifies the acts of the master ; the plaintiffs having no claim to the property, but through him. Payment must be made to destroy this right. Giving security which turns out to be valueless does not prevent its excercise. The case of *Descadillas* v. *Harris,* 8 *Greenl.* 298, is decisive on this point.

The commissions charged were but the small profits made by *Vargas,* where he purchased of others to sell to *Winter,* and were a proper subject of charge. But if they were not, it would only lessen the amount of his claim by that sum, and would not touch the right of stoppage.

This right was seasonably exercised.

As has been said, the right to stop the goods *in transitu,* continues until they come into the possession of the consignee at the port of delivery. In this case that possession was gained only by service of the writ in this action. Long before that time, a demand had been made by direction of *Vargas'* general correspondents; these acts had been ratified by the special agent of the defendant ; a demand had been made by him on the Collector who then had possession of the goods, with a request for leave to enter the same for the defendant ; and finally possession had been actually taken by him. Any one of these acts was a sea-

sonable and legal exercise of this right.   A claim of the right to stop the goods made on any one in possession is sufficient to revest the property in the vendor ; even although taken possession of by the public authorities and stored in the  public storehouses. But on the part of the consignee a claim is not sufficient. *Wheaton's Selwyn,* 443, 451 ; *Litt* v. *Cowley,* 7 *Taunt.* 169 ; *Barrett* v. *Goddard,* 3 *Mason,* 107 ; 2 *Kent's Com. 2d Ed.* 540 ; *Coats* v. *Railton,* 6 *B. & Cres.* 422 ; *Naylor* v. *Dennie,* 8 *Pick.* 198. *Mills* v. *Ball,* 2 *B. & P.* 457 ; *Northey* v. *Field,* 2 *Esp. R.* 613.

Nor was it necessary  to make payment or tender of payment of the amount of sales of  the outward cargo, or of the value of the freight, before the right  to  stop  the  goods *in transitu* could be asserted.

In a case like this between consignor and consignee, the lien on the property shipped is an entire one until it is removed by payment of the amount due ;  and  it makes no difference, if a partial payment has been made, or expenses have been incurred. In this case no freight was due, for *Winter,* the consignee, imported the goods on his own account and in his own vessel.   No freight for the transportation of them could be due to any one ; for if so, it must be from *Winter* to *Winter.   Hodgson* v. *Loy,* 7 *T. R.* 436 ; 2 *Kent,* 554 ; *Feise* v. *Wray,* 3 *East,* 100.

But if the freight had been due, its payment was waived in this case by *Peterson's* placing his refusal to deliver the cargo on another ground.   *Hussey* v. *Thornton,* 4 *Mass. R.* 405.

The freight was due to third persons in the instances, where it was held necessary to pay it on stopping the goods *in transitu.* Perhaps the duties payable on this cargo, after the collector had taken the possession, might come under the principle of the cases cited on the other side ; but the  amount of duties was tendered to the collector.

*Mellen* enforced  the positions taken by *Deblois,* replied to the arguments of the opening counsel, and commented on the authorities cited.

*Preble* urged the objections against the claim of *Vargas* to retain the goods against the creditors of *Winter ;* and argued, that both principle and the weight of precedent were in his favor.

The action was continued *nisi*, and the opinion afterwards drawn up by

WESTON C. J. — *Joseph Vargas*, having due authority therefor, furnished for the intestate's barque a return cargo of molasses, in part payment of which the net proceeds of the outward cargo were applied. It is insisted, that in this business he acted as factor ; and as such could not exercise the right, upon which the defendants' title depends. The circumstance of his having purchased the molasses specially for this purpose, can make no difference. It was paid for out of his own funds; and he stood in relation to the intestate in the character of a vendor, as much as if it had been supplied from his own warehouse. And it has been directly adjudged that a factor or agent, who purchases goods for his principal, and makes himself liable to the original vendor, is so far considered in the light of a vendor, as to be entitled to stop the goods. *Feise et al.* v. *Wray*, 3 *East*, 93. Every reason, upon which this right is founded, applies with equal force to a purchaser so circumstanced.

The bills drawn by the master, payable to *Vargas*, for the amount due on the purchase of the return cargo, were not equivalent to payment. They were the evidence of the debt due to *Vargas* ; and did not deprive him of any other remedy, authorized by law, where the vendor becomes insolvent. This further remedy, arising from the right of stoppage *in transitu*, is analogous to the lien, which the vendor of real estate has in equity upon the estate sold for the purchase money. It is not affected or impaired, by taking the bond, bill or note of the purchaser. 4 *Kent*, 153. The master, in drawing the bills on the owner, was acting on account of the latter ; and although sufficiently authorized thereto before, his doings have been since ratified, by the representatives of the owner, in claiming the molasses thus purchased. It was the usual mode of doing business of this sort. And although by the form of the bills, the master may have made himself personally liable, there is no reason to suppose that his security was relied upon by *Vargas*, or that, by accepting it, he waived other remedies. *Descadillas et al.* v. *Harris*, 8 *Greenl.* 298. The master was not acting for himself. He was the mere

agent of the owner. In the case before cited from *East,* where the right of stoppage was recognized, bills had been drawn for the merchandise sold, which had been accepted and negotiated.

Nor do we perceive, that the commissions charged by *Vargas,* for doing the business and negotiating the bills, can deprive him of the right he claims. As indorser of the bills, he became conditionally liable to the holder, if protested for non acceptance, or for non payment. And this business done for the owner, together with the purchase of the molasses, well entitled him to a commission. He became liable upon the bills, not for the benefit of the drawer, but of the holder. It is not easy to conceive how this liability could have the effect to impair any of his remedies against the owner, who was bound to accept and pay the bills. There is very little analogy between this case and that of a factor, who receives a *del credere* commission. The factor there guaranties to his principal the solvency of others, who are the purchasers of his goods. Here *Vargas* became responsible to others, if the principal, for whom he had purchased and who had purchased from him, did not duly honor his bills. In either case, every legal remedy remains in full force against the purchaser. In the case cited from *East,* which in many of its points has a near resemblance to the one under consideration, the party who purchased and supplied the cargo, and who negotiated the bills, charged and was allowed a commission.

The right of stoppage *in transitu,* upon the insolvency of the purchaser, has been well settled in the commercial world. It had its origin in the civil law ; was first recognised in *England* in equity, and was subsequently adopted by the courts of common law. It is analogous to the common law right of lien, being an equitable lien, which enables the vendor, after he has parted with his possession, to resume it at any time before the vendee has acquired it, and to retain the goods, until the price has been paid or tendered. The leading principles in relation to the doctrine, have been established by judicial decisions. There is very little conflict of authority, as to who may exercise the right. The principal difficulty has been in some of the cases, as to when the transit ends, upon which the right ceases. In regard to this point, there is not entire harmony in the decisions ; and there has

been much refinement in some of the distinctions, upon which they have turned. The right of stoppage is a favored claim; and in general it continues until the goods have come to the possession, or under the direction of the vendee.

It is contended, that the right ceased in this case upon the delivery of the goods on shipboard, because the vessel belonged to the vendee, and because the master was his agent. On the other hand it is urged, that as the goods were destined to be delivered to the vendee at *Portland,* the transit continued, until they were received by him or his representatives at that port. It is conceded that such would have been the fact, had the vessel been a general ship. The decision of the cause will mainly depend upon the question, whether the vessel in this case belonging to the vendee, and in his employment, a different rule is to be applied.

In *Fowler et al.* v. *McTaggard et al.* cited in *Inglis* v. *Usherwood,* 1 *East,* 515, it was ruled by *Grose J.,* that upon the delivery of a quantity of tobacco on board a ship, chartered for three years by the vendee, the transit was at an end, and the right of stoppage ceased. And it appears in *Hodgson* v. *Loy,* 7 *T. R.* 436, where the case was again cited, that a motion for a new trial was overruled. In the case last cited from *East, Grose J.,* recognizes it as a general rule, that the delivery of goods by the vendors, on board a chartered ship of the vendee, is a delivery to the vendee himself. *Lawrence J.,* expressed himself to the same effect, but the right of stoppage was there allowed, upon the construction put upon the law of *Russia,* where the goods were delivered. In the case before *Grose J.,* the tobacco was not shipped to be delivered to the vendee, but for a foreign destination.

Where goods are shipped on board a vessel, appointed by the vendee, to be transported not to his residence or to be received by him, but to other markets, there is a termination of the transit, and the right of stoppage by the vendor ceases. *Noble* v. *Adams,* 7 *Taunton,* 59; *Stubbs* v. *Lund,* 7 *Mass.* 453; *Rowley* v. *Bigelow,* 12 *Pick.* 307. And this is the true principle, upon which *Fowler* v. *Taggard* turned, as stated in the opinion of the

court, delivered by *Lawrence J.* in *Bohtlingk* v. *Inglis,* 3 *East,* 381, in which *Grose J.* who tried the former case, concurred. *Lawrence J.* disclaims, for himself and for *Grose,* any intention in *Inglis* v. *Usherwood,* to state, that a delivery on board the vendee's ship was a delivery to him, so as to take away the right of stoppage, except as in the case of *Fowler* v. *McTaggard,* where the goods were sent abroad, stating truly, that *Inglis* v. *Usherwood* was decided upon the law of *Russia.* And he further insisted, that neither case was inconsistent with the judgment then pronounced in *Bohtlingk* v. *Inglis,* that the delivery of goods on board of the chartered ship of the vendee, to be transported to him, did not preclude the right of the vendor or consignor to stop the goods *in transitu,* any more than if they had been delivered on board a general ship. The court there expressly repudiate any distinction, between a general and a chartered ship ; saying that they were misunderstood, if any such inference can be drawn from the former cases. And certainly they were competent to explain their own meaning.

It is a little remarkable, that in *Bolin et al.* v. *Hoffnagle,* 1 *Rawle,* 9, the Supreme Court of *Pennsylvania,* although their attention was called to the case last cited, decided otherwise ; and principally upon the authority of the cases there commented upon, giving them an effect and bearing, disclaimed by the court, by whom they were decided. The learned Judge, by whom the opinion of a majority of the court was delivered, goes into an elaborate consideration of a delivery actual and constructive ; and deduces that it is only where the delivery is constructive, that the right of stoppage exists. A delivery on board the consignee's or vendee's own ship, he calls actual. But a delivery to the servant or agent of the party, is as much actual, as if delivered to the party himself. And whether that servant or agent is specially deputed for the purpose, or some one is deputed, having similar commissions to discharge for others ; whether the vendee employs his own vessel or carriage, or causes the goods to be transported for an adequate compensation in that of another, does not appear to us to make any difference. The delivery is actual in the one case, as well as in the other. The sale is complete. The property is transferred. The right of stoppage is not founded

upon any imperfection in the sale, nor does it rescind the contract; it only authorizes the vendor to take the goods, until the price is paid. Two, out of the five members of the court, did not concur in the judgment cited from *Rawle*. The opinion of the dissenting Judges seems to us to be best supported by authority.

*Stubbs* v. *Lund*, before cited, is a case precisely in point. Chief Justice *Parsons* goes into a consideration of the question directly, whether the vendee of the goods, being the owner of the ship and appointing the master, places the case, in reference to the right of stoppage *in transitu*, upon any different ground, than if the goods were delivered on board a general ship, and he expressly decides, speaking for the court, that it does not. That if goods are put on board the consignee's ship to be transported to him, the transit continues for the purpose of stoppage, until they come to his actual possession ; but that the rule is otherwise if shipped to be conveyed to a foreign market. That case has never been overruled ; and was decided, while *Maine* was a part of *Massachusetts*. It is true, that in *Illsley et al.* v. *Stubbs*, 9 *Mass.* 65, where the same property was in controversy, under the same facts, the court assign additional reasons for coming to the same result. But *Sewall J.* by whom the opinion of the court was delivered, says, " with the aid however of the doctrine of stoppage *in transitu*, the question in this case may be more conclusively, and with some, more satisfactorily decided." He then, after examining the authorities, and stating his reasons at large, confirms the doctrine, previously laid down in *Stubbs* v. *Lund*. And he shows that the cases, apparently conflicting in *England*, may be reconciled by the distinction, that in the one case, goods were shipped for a foreign destination, and in the other, were to be transported to the consignee.

If this doctrine is not reaffirmed in *Rowley et al.* v. *Bigelow et al.* 12 *Pick.* 307, that case did not require it; turning as it did upon the destination of the goods. There is nothing in it however impeaching the former cases. And we hold it to be well settled law in *Massachusetts* and in this state, and we think also in *England*, that if goods, as in the case before us, are delivered on board the ship of the consignee or vendee to be transported to him, if he becomes insolvent, the vendor has a right to stop them

*in transitu,* until received by the vendee. It results, as a part of the doctrine, equally sustained by the authorities, that the receipt of goods by the master of the vendee's ship, does not put an end to the transit. He stands in this respect like all other agents, who are employed to transport the goods. In certain cases, where goods have been received by an agent to be forwarded, on the further order of the vendee, to an ulterior destination; or where the vendee, having no warehouse of his own, availed himself of that of a packer; or where the vendee obtained the use of the vendor's warehouse for the storage of the goods, the right of stoppage has been held to cease. In these, and in other cases of the same class, cited for the plaintiffs, depending on their peculiar circumstances, we find nothing necessarily, if at all, conflicting with the doctrine, which we have recognised.

Another point taken is, that *Vargas* should have paid or tendered to the plaintiffs, the amount of the outward cargo and the freight, before he could be allowed to exercise the right he claims. But the right, when enforced, does not rescind the contract. *Hodgson* v. *Loy,* 7 *T. R.* 440. The vendee, or his assigns, may, notwithstanding recover the goods, on payment of the price. And it has been held, that the vendor may sue for and recover the price, notwithstanding he had *actually stopped* the goods *in transitu,* provided he be ready to deliver them upon payment. *Kymer* v. *Sowercropp,* 1 *Camp.* 109. The goods are stopped, to enforce an equitable lien for what remains unpaid. Hence payment in part, has the effect only to diminish the lien *pro tanto* on the goods detained. *Hodgson* v. *Loy,* and *Feise* v. *Wray,* before cited. The net proceeds of the outward cargo were applied in part payment for the molasses. Of the same character is the increased value, arising from the transportation. The freight is equivalent to a partial payment. If the goods stopped are of greater value, from the former payment, and their appreciation here, than is wanted to pay *Vargas* his balance, the plaintiffs have nothing to do but to pay or tender to him the amount due, and they will have a right to reclaim the molasses. But the vendor, to entitle him to exercise his right of stoppage, is under no obligation to refund, what he may have received as part payment.

The goods, not having been paid for, and the vendee having become insolvent, the vendor had a right to stop them *in transitu*. Does it appear to have been seasonably exercised in the case before us ? We are of opinion that it does. *Fessenden, Thompson & Co.* were the correspondents of *Vargas*, in this country. They were aware that he was in danger of sustaining loss. They interpose to do an act for his benefit, which tending greatly to promote his interest, it could not but be presumed he would approve. Upon being advised of it, he requests them to take care of his interest. His special agent and attorney, *Nicholas Vargas*, also adopts and approves the course pursued by his correspondents here. *Merrill* was sent on board for them, and upon the arrival of the vessel in the outer harbor of *Portland*, he notified first the mate, and then the master, of the claim of *Vargas*. This claim, thus interposed and thus ratified, we regard as a competent exercise of the right of stoppage.

Notice to the carrier, or to any one having charge of the goods, before the transit ends, is sufficient for this purpose. *Mills* v. *Ball*, 2 *Bos. & Pul.* 457 ; *Litt* v. *Cowley*, 7 *Taunton*, 169. *Nicholas Vargas*, the undoubted agent and attorney of *Joseph*, renewed the claim of the latter, immediately upon his arrival in *Portland*, of which he notified the collector, while the goods were in his possession, and then lying in the government stores. This of itself was sufficient, according to the case of *Northey et al.* v. *Field*, 2 *Esp. Rep.* 613, where a quantity of wines had been lodged in the King's stores, the duties not being paid, and while there, they were claimed by the agent of the consignor, this was held by *Lord Kenyon* a legal stoppage *in transitu*, although they had been previously demanded by the assignees of the consignee. And this last case, where the assignees had only made a demand, differs from the case of *Holst* v. *Pownal*, 1 *Esp. Rep.* 240, where they had taken actual possession. The latter has been repudiated ; but *Chancellor Kent* cites the former with approbation. 2 *Kent*, 430. The right of stoppage, being a favored claim, may be exercised by notice, but no case has been adduced to show that it ceases upon notice, and the interposition of a claim merely, on the part of the consignee.

*Judgment for the defendants.*