GAETANO AINIS, RESPONDENT, *v.* MARSHALL AYRES, AS ASSIGNEE FOR THE BENEFIT OF CREDITORS OF SAWYER, WALLACE & CO., APPELLANT.

*Sales — stoppage* in transitu *—acceptances by an agent, not a payment although the bills of lading are surrendered by the vendor.*

One Ainis, a merchant in Sicily, sold brimstone to a firm in New York. The firm wrote Ainis in regard to payment: "We beg to say we open credit in reimbursement of purchases with Messrs. Fred Huth & Co., London, Credit Lyonnais, London Branch, *our house, Mr. L. W. Sawyer, London.*" Ainis drew on Sawyer, who represented the firm in London, drafts, which, with the bills of lading attached, were forwarded to Sawyer, who accepted them, he then having sufficient money of the firm to pay the drafts. Sawyer sent the bills of lading to the firm in New York and charged them upon his books, as agent, with the amount of the drafts.

Before the drafts matured or the goods arrived in New York the firm failed and made a general assignment to one Ayres. The drafts subsequently fell due and were not paid.

In an action by Ainis against the assignee, both claiming the goods:

*Held*, that Ainis had not, by surrendering the bills of lading for the acceptances of Sawyer, lost his right of stoppage *in transitu.*

That the acceptances of Sawyer, described by the firm as of "our house," were, in effect, the acceptances of the firm and must be regarded as having been taken by Ainis as collateral security, and not in payment of the goods.

That the delivery of the bills of lading by Ainis to Sawyer was a delivery to the agent for the firm, his principal; and as no rights of third persons had intervened, by their transfer to a *bona fide* holder before the goods had reached New York, Ainis' right to stop the goods in transit was not affected.

APPEAL by the defendant Marshall Ayres, as assignee for the benefit of the creditors of Sawyer, Wallace & Co., from a judgment of the Supreme Court, entered in the office of the clerk of the city and county of New York, in favor of the plaintiff for $6,794.29, with interest amounting to $138.24, after a trial by the court without a jury at the New York Circuit.

*Michael H. Cardozo*, for the appellant.

*Robert L. Harrison*, for the respondent.

BARRETT, J.:

The question here is, whether the right of stoppage *in transitu* was lost by the plaintiff's receipt of acceptances given by the vendee's agent.. The facts are simple and undisputed. In July and August, 1890, the plaintiff, who is a merchant at Messina, in Sicily, sold (in two lots of 200 tons each) 400 tons of brimstone to the firm of Sawyer, Wallace & Co., of this city, at agreed prices. The terms of sale were embodied in a letter from Sawyer, Wallace & Co. to the plaintiff, which reads as follows:

"Concerning the terms under which we purchase brimstone, we beg to say that we open credit in reimbursement of purchases with Messrs. Fred Huth & Co., London, Credit Lyonnais, London Branch, *our house, Mr. L. W. Sawyer, London*, and, finally, if the reimbursement should be on Paris, with Messrs. Marcuard, Krauss & Co., the Credit Lyonnais of that city, instructing them to honor your draft at 90d. sight, documents attached."

The brimstone was duly shipped to New York, and the plaintiff drew his drafts upon Sawyer, of London, the person referred to in the above letter as "our house, Mr. L. W. Sawyer, London," for the agreed prices. These drafts were forwarded to Sawyer, in London (together with the bills of lading), and were duly accepted by him.

Sawyer was the agent and legal representative in London of Sawyer, Wallace & Co. He was not a banker, but he made collections in large amounts on the other side, and remitted such collections to that house. The credit which he afforded his principals was based partly upon such collections and partly upon moneys deposited by them with him. At the time of his acceptance of the drafts in question he was in funds due or belonging to Sawyer, Wallace & Co. to the amount of many thousands of pounds. Upon the receipt of the documents, Sawyer sent the bills of lading to his principals in New York and charged them in his agency account with the amount of the drafts. Before the drafts matured, and before the arrival of the goods in New York, Sawyer, Wallace & Co. failed and made a general assignment to the defendant. Upon the arrival of the goods in New York both parties claimed them — the defendant, as the assignee of Sawyer, Wallace & Co., and the plaintiff by virtue of his claim to stop them *in transitu.* The goods were sold amicably and the proceeds deposited in a trust company to abide the result of this litigation. Sawyer's drafts have since been dishonored. The learned judge at Special Term gave the plaintiff judgment, holding that the right of stoppage *in transitu* was not lost by the acceptance of these drafts.

We may premise by saying that if these acceptances defeated the plaintiff's right of stoppage *in transitu*, it was certainly not because of the rule, misapplied by the appellant, that such right is lost where bills of lading have been indorsed by the vendee to a *bona fide* transferree for a valuable consideration (as laid down in *Becker* v. *Hallgarten*, 86 N. Y., 167, and all the earlier cases), but solely because the plaintiff's acceptance of Sawyer's draft was an absolute payment for the goods. We may further premise that if the latter contention should be sustained, as matter of fact, then the vendees were wholly discharged from all liability and the plaintiff has not only no case as to the goods, but no claim against the assigned estate. The defendant would thus have us presume that, in accepting Sawyer's draft, the plaintiff intended to discharge the vendees, to abandon his lien upon the goods and to rely solely upon the credit of the vendee's agent. This would be a violent presumption especially in view of the fact that Sawyer is spoken of in the letter above quoted as " our house," that is, our, Sawyer, Wallace & Co's.

London house, in other words, ourselves. And that presumption would be as unreasonable here as that referred to in *Descadillas* v. *Harris* (8 Greenl., 247) hereafter quoted. It is perfectly well settled that the vendor's right of stoppage *in transitu* is not lost by his having received the acceptances of the vendee, even though he may have negotiated the bills so that they are outstanding in third hands unmatured. (Benjamin on Sales [4th Am. ed.], § 835.) Thus, in *Feise* v. *Wray* (3 East, 93), the bankrupt's acceptances were treated as part payment so far as something might be realized on them from his estate. To that extent only it was said to reduce the vendor's equitable lien. This case was referred to in *Edwards* v. *Brewer* (2 Mees. & Wels., 374), Parke, B. saying:

" It is settled by the case of *Feise* v. *Wray*, that by an acceptance of bills the vendor's right to stop *in transitu* is not taken away." In *Miles* v. *Gorton* (2 Cr. & Mees., 504), the rule was extended to a case where the vendor had not only accepted the vendee's bill, but had negotiated it. The English rule has been generally followed in this country. Thus in *Clapp* v. *Sohmer* (55 Iowa, 273), the vendor had accepted the vendee's note. It was held that the vendor was not concluded, the court·saying that a " promissory note cannot be regarded as payment *unless it has been expressly received as such.*" The case of *Newhall* v. *Vargas* (13 Maine [Shepley, vol. 1], 103), goes still further and is entirely analogous to the case at bar. There the master of the vessel upon which the goods were shipped was the agent of the vendee. He drew bills on the vendee payable to the vendor for the amount due on the purchase. It was held that the acceptance of these bills by the vendor did not defeat his right as against the vendee. "The master," says Chief Justice Weston, " in drawing the bills on the owner, was acting on account of the latter. * * * It was the usual mode of doing business of this sort. ·. And although, by the form of the bills, the master may have made himself personally liable, there is no reason to suppose that his security was relied upon by Vargas (the vendor) or that by accepting it he ·waived other remedies (citing *Descadillas* v. *Harris*, *supra*). The master was not acting for himself. *He was the mere agent of the owner.*"

In the case there cited (*Descadillas* v. *Harris*) it was held that the presumption of payment in receiving a negotiable note " is liable

to be rebutted by proof of facts or circumstances inconsistent with it," and the court, in reviewing the facts upon which a claim somewhat analogous to the present was made, aptly inquired : " Is it probable, or rather is it to be presumed, that they (the plaintiffs) intended to discharge the most responsible security and rely solely upon the most irresponsible ; to decline the hypothecation, absolve the owner from his personal liability and trust wholly to the solvency of the master ? "

*Bell* v. *Moss* (5 Whar., 203), is still nearer in point to the present case. There the vendor received drafts on third persons. It is true that these drafts were not accepted by the third persons, but the liability of the third persons was fully discussed and the rule laid down that such acceptances were naturally, and, in the absence of an express agreement to the contrary, nothing more than collateral security for the primary debtor's obligation. " Here," said Chief Justice GIBSON, " the consignees were the vendees and primary debtors, and what did they pledge as a guaranty ? The acceptances of De Lizardi & Co.; and no principle is surer than that a creditor may press all his securities at the same time." This learned judge also stated that " the giving of the buyer's own note or bill, which though it operates an extension of the credit, extinguishes *not* the original contract ; as well as by *payment in the bills of a third person which is not absolute satisfaction, unless it were declared so by the terms of the bargain."* He summed up this branch of the case with these suggestive remarks : " It would, indeed, startle the commercial community to say, that where the consignor has collateral means of payment, uncertain as it must be in its results, he shall not press a lien growing incidentally out of the consignee's direct liability."

That the acceptance of Sawyer was a mere collateral security for the primary obligation of the vendees is apparent from all the circumstances of this case. There is not a suggestion in the correspondence or documents that the unsecured acceptance of this agent was to be taken as a substitute for the primary obligation of his principals, secured as that was by the vendor's lien. Everything, in fact, points the other way. Not only is Sawyer spoken of as the vendee's London house, but the arrangement with him and others is spoken of as a " credit." This is a term perfectly well understood in commercial circles. It implies security for the meeting of his

obligations by the holder of the credit, and it is not intended, ordinarily, as a substitute for these obligations. "A credit with a banker," said Chief Justice GIBSON in the case last cited, "is not payment, but a means of payment more or less secure, according to the solidity of the depositary; and the greater or less certainty of the security cannot affect the question of its character; it is but a security still."

Here, however, Sawyer was not even a banker, but a merchant representing the vendees and accepting for them and as their agent, though not specifying the agency in terms upon the face of the drafts. The distinction between the facts of this case and those under consideration in *Gibson* v. *Tobey* (46 N. Y., 637); *Hall* v. *Stevens* (116 id., 201) and *Whitbeck* v. *Van Ness* (11 Johns., 410) is so wide as to call for but a passing comment. These were cases of executed sales, and the notes or drafts of third persons were taken in payment for the goods sold and delivered, and were so taken *at the time of delivery*. The distinction between such cases and the cases of executory contracts, where the goods have not yet reached the vendee and the right of stoppage *in transitu* is asserted, is pointed out by SPENCER, J., in *Whitbeck* v. *Van Ness* (*supra*). That learned judge comments upon *Owenson* v. *Morse* (7 Term R., 60) and says that that case will be found, on examination, to turn "on the right to stop goods *in transitu*. Owenson purchased from Morse some plate and paid for it in the notes of a third person. Morse retained the plate to have Owenson's arms engraved at Morse's expense. In the *interim* the maker of the notes failed; and on refusal to deliver the plate, Owenson brought trover, and failed; the court holding *that the bargain was not so perfected but that the seller might stop the goods in transitu*" That learned judge also referred to *Roget* v. *Merritt* (2 Caines, 120), where he says: "We adopted the same principle that, in an executory contract, the consideration having failed, the vendor had a right to withhold a delivery of the goods."

The delivery of the bills of lading to Sawyer did not affect this question. The general rule is not disputed, that the delivery of the *indicia* of title is equivalent to the delivery of goods. "But," as Mr. Benjamin says, at section 1211 (we are still quoting from the fourth American edition of his work on Sales), "though the vendor's lien is thus divested by reason of the complete delivery of the *indicia*

of property, he may, if the goods have not yet reached the actual possession of the buyer, and if no third person has acquired rights by obtaining a transfer of the bill of lading *from the buyer*, intercept the goods in the event of the buyer's insolvency before payment, by the exercise of the right of stoppage *in transitu.* These principles in relation to the effect of a bill of lading were first conclusively established in the great leading case of *Lickbarrow* v. *Mason*, on the authority of which very numerous decisions have since been made, and will be found collected in Smith's Leading Cases. On this mode of delivery the law is free from doubt."

In the case at bar there was no transfer of the bills of lading *from the buyers*, and no third person ever acquired any right of transfer from them. The transfer to Sawyer was simply a transfer to his principals, the buyers, and from that point on there was no further transfer. The question of payment as between Sawyer, Wallace & Co., and their agent is entirely immaterial. That is simply a question of debit and credit on the agency books. Such cases, therefore, as *Crocker* v. *Whitney* (71 N. Y , 161), and *Briggs* v. *The Central National Bank* (89 id., 182) have no application to the underlying question here, and it is idle to talk of payment for the brimstone having been made by Sawyer, Wallace & Co , to Sawyer before the execution of their assignment. That firm received the bills of lading, but never paid the plaintiffs, and failed before the actual arrival of the goods.

We think it entirely clear that thus the plaintiff's equitable right to stoppage *in transitu*, a right so favored in the law (*Northey* v. *Field*, 2 Esp., 613), was not lost, and that he is entitled to recover upon two distinct grounds : First, that the acceptances of Sawyer were, in substance, the acceptances of the vendees ; second, that even if such acceptances were treated as the acceptances of a third person, they were not, as matter of fact, taken in absolute payment for the goods.

The judgment should, therefore, be affirmed, with costs.

VAN BRUNT, P. J., and ANDREWS J., concurred.

Judgment affirmed, with costs.